IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION

CRYSTAL DARNELL-OGLE,          )
                               )
            Plaintiff,         )
                               )
      v.                       )     Case No.
                               )     12-5102-CV-SW-REL-SSA
CAROLYN W. COLVIN, Acting      )
Commissioner of Social Security, )
                               )
            Defendant.         )

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Crystal Darnell-Ogle seeks review of the final decision of the

Commissioner of Social Security denying plaintiff's application for disability benefits

under Titles II and XVI of the Social Security Act ("the Act").  Plaintiff argues that the

ALJ erred in (1) formulating a residual functional capacity without relying on the

opinions of Dr. Sweeten and Mr. Ramsey,[1] and (2) improperly assessing plaintiff's

credibility.  I find that the substantial evidence in the record as a whole supports the

ALJ's finding that plaintiff is not disabled.  Therefore, plaintiff's motion for summary

judgment will be denied and the decision of the Commissioner will be affirmed.

## I.    BACKGROUND

On February 11, 2010, plaintiff applied for disability benefits alleging that she

had been disabled since December 1, 2006.  Plaintiff's disability stems from anxiety,

panic attacks, paranoia, posttraumatic stress disorder, memory problems, and a lack of

concentration and focus.  Plaintiff's application was denied on April 22, 2010.  On

---

[1]Plaintiff consistently refers to Mr. Ramsey as a doctor; however, he has a masters
degree, not a doctorate degree.

November 29, 2010, a hearing was held before an Administrative Law Judge.  On

March 17, 2011, the ALJ found that plaintiff was not under a "disability" as defined in

the Act.  On August 5, 2012, the Appeals Council denied plaintiff's request for review.

Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a

"final decision" of the Commissioner.  The standard for judicial review by the federal

district court is whether the decision of the Commissioner was supported by substantial

evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971);

Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d

178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The

determination of whether the Commissioner's decision is supported by substantial

evidence requires review of the entire record, considering the evidence in support of

and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB,

340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The

Court must also take into consideration the weight of the evidence in the record and

apply a balancing test to evidence which is contradictory."  Wilcutts v. Apfel, 143 F.3d

1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450

U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion."

Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5

(8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.    BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.      Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.      Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.      Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.     THE RECORD

The record consists of the testimony of plaintiff and vocational expert Cynthia Younger, in addition to documentary evidence admitted at the hearing.

## A.     ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

## Earnings Record

The record shows that plaintiff earned the following income from 1997 through 2010:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1997 | $ 2,120.42 | 2004 | $ 3,988.92 |
| 1998 | 1,917.25 | 2005 | 3,015.95 |
| 1999 | 10,375.13 | 2006 | 751.27 |
| 2000 | 7,496.61 | 2007 | 0.00 |
| 2001 | 6,198.02 | 2008 | 159.18 |
| 2002 | 10,637.48 | 2009 | 0.00 |
| 2003 | 9,953.15 | 2010 | 0.00 |

(Tr. at 116).

**Function Report**

In a Function Report dated February 17, 2010, plaintiff reported that she does not need reminders to take care of personal needs or to take medication (Tr. at 143). She prepares her own meals daily, she does dishes, mops, vacuums, dusts, cleans the bathroom, washes clothes, folds laundry, and makes her bed. Plaintiff goes outside to smoke cigarettes or if she has to go somewhere. She rides in a car; she cannot go out alone because she feels like people are watching her. "Right now I do not drive because I do not have a valid driver's license". She is able to shop in stores once a week, but she does it as quickly as possible. She is unable to pay bills, handle a savings account or use a checkbook because she does not have any money (Tr. at 144).

Plaintiff's daughter helps her with the DVD player and the satellite remote. Plaintiff spends time with her roommates, and she calls or texts her daughter every day.

She has no trouble getting along with others.

Plaintiff's impairments affect her ability to talk, hear, see, remember, complete tasks, concentrate, understand, follow instructions and use her hands. "Understanding - I take things the wrong way." She follows written instructions "pretty well" but may need to read the instructions more than once. She does not follow oral instructions very well because her mind wanders. She gets along with authority figures well.

## B.     SUMMARY OF MEDICAL RECORDS

On March 29, 2006, plaintiff, age 25, reported to St. John's Medical Center Emergency Room with a chief complaint of "altercation" (Tr. at 242-247). Plaintiff reported that she was jumped and was hit in the back of the head. She was experiencing neck pain and anxiety. She reported no social concerns. She was an occasional drinker and a regular smoker. Her exam was entire normal, including her neck. She was diagnosed with cervical strain and hand contusion. An x-ray of her cervical spine showed degenerative changes (Tr. at 247). She was discharged with several illegible prescriptions.

On July 19, 2006, plaintiff checked herself into St. John's Regional Medical Center for drug and alcohol abuse, anxiety and depression (Tr. at 198-209). On admission she tested positive for marijuana and cocaine. She reported to Dr. Tabassurn Saba at the Hawthorne Center that she started using drugs heavily after her mother passed away.

> The patient had experimented with illicit drugs in the distant past, but after the birth of her child, which was five years ago, she became sober. She reported that her mother, who had a severe mental illness and was in a straight

6

psychiatric hospital, died secondary to pneumonia last year.  After that, she
started using drugs. She was using methamphetamine and alcohol heavily. She
was also smoking marijuana and prior to admission, she used cocaine for the
first time.

(Tr. at 199).

Plaintiff reported that while she was growing up, her mother experienced

extreme paranoia and heard voices.  After plaintiff started using drugs, her eight-year

relationship ended, she lost her employment, and she became homeless (Tr. at 201).

"She had to stay in a house where there were drugs everywhere and she kept on going

downhill to the point that her boyfriend, who is the father of her child, has the custody of

her child and the patient is very upset about all this."

Plaintiff was observed to be pleasant and cooperative.  Her mental status exam

was normal except that she had a depressed mood, dysphoric affect, and she cried a

lot during the interview.  Recent and remote memory were intact, "no auditory or visual

hallucinations.  No evidence of delusion."  She was noted to be "intelligent. She is in

good physical health and she is motivated to get treatment."  Her thought process was

organized, thought content normal, she had a neat and clean appearance with normal

speech and affect.

Plaintiff reported that she engaged in volleyball, and exercises by doing squats

and sit-ups, she fishes, she does word searches, she gets together with friends and

family, she goes shopping and eats out, she parties with friends.  She reported that she

makes friends easily, but "hard in big groups."  She reported that she considers herself

a social person but prefers being alone when she is depressed (Tr. at 209).  She

reported problems with social skills, finances, addiction, general weakness, endurance, social phobias, motivation and guilt. When asked for her current occupation, she wrote, "No, want to go to school." (Tr. at 209).

Plaintiff was given Ativan (anti-anxiety medication) for methamphetamine and alcohol withdrawal. She was also started on a low dose of Celexa (antidepressant). Plaintiff participated in psychotherapy groups. During her two days in the hospital, she showed "rapid improvement in her symptoms." (Tr. at 200). No evidence of any psychosis was alleged by plaintiff or observed by medical professionals (Tr. at 200, 201). Plaintiff was discharged with directions to take Valium (treats anxiety) for two days and then discontinue. She was told to take Protonix (reduces stomach acid) and Celexa (antidepressant) daily. Her discharge diagnoses were:

| | |
|---|---|
| Axis I: | Mood disorder secondary to substance abuse |
| | Polysubstance abuse versus dependence |
| Axis II: | No diagnosis at this time, but needs further evaluation |
| Axis III: | No ongoing medical problems |
| Axis IV: | Severe stressors |
| Axis V: | GAF on admission 30-35;[2] on discharge 50-55.[3] |

---

[2]A global assessment of functioning of 31 to 40 means some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).

[3]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

Plaintiff was told to completely abstain from drugs and alcohol and she was referred to a substance abuse program.

December 1, 2006, is plaintiff's alleged onset date.

On February 4, 2007, plaintiff presented to the Emergency Room at St. John's reporting panic attacks for the past two weeks (Tr. at 263-265). She stated she was afraid to leave her house and was experiencing public paranoia and hallucinations. Plaintiff had consumed a 12-pack of alcohol per day for more than a year, and she "cut down 2 weeks ago, quit altogether 1 week ago." Her symptoms were noted to be "mild" and the only mitigating factor was "stopping alcohol". She was noted to have no prior anxiety, no prior psychiatric treatment. She continued to smoke cigarettes. Her physical exam was within normal limits, and she was oriented times four. No hallucinations were observed in the emergency room. She was diagnosed with anxiety and "hallucinations - resolved." After being treated with Ativan (treats anxiety), plaintiff was discharged.

On October 30, 2007, plaintiff saw Dr. Rex Gallemore at Country Care Clinic to establish care and complaining of panic attacks (Tr. at 234). She reported having no significant past medical history but reported a history of depression, anxiety disorder and panic disorder. "The patient takes no routine medications. . . . [S]he is complaining of being extremely nervous and having frequent panic attacks." Plaintiff said she had experienced panic attacks, anxiety and depression since she was 18, but that her symptoms had "greatly increased in intensity during the past one month."

Plaintiff was given prescriptions for Celexa (antidepressant) and Klonopin (treats anxiety).

On January 5, 2008, plaintiff reported to the Hawthorne Center with a chief complaint of "alcohol detox" (Tr. at 210-220).

> The patient states that since July, she has been drinking every day and she wants to get into a 10-step Ozark Mental Health Center, but she needs to get detox. Reports she usually drinks 12-pack plus pint of vodka a day. She also has a history of some cocaine use about 2 years ago, but she quit that. Reports history of marijuana. Denies history of meth use. Reports history of withdrawal symptoms such as tremors or shakes with alcohol. Denies history of DTs,[4] blackouts, or seizures. Denies history of auditory or visual hallucinations. Denies history of suicidal or homicidal ideation. Denies history of suicide attempt or self-mutilation. Reports she does not think depression is an issue. She did try, in the past, Celexa 10 mg daily and Klonopin 1 mg three times a day, but she has not had it in months, because she has been drinking and she does not think she needs that right now. Reports she tried Valium and Xanax and she liked those.

Plaintiff denied any medical problems. She denied a history of head injuries.

Plaintiff reported having lost her home and lost her job. "She was working at a bar." Plaintiff reported that her energy level was good, she had no unusual fatigue. She had full range of motion in all joints and there was no evidence of underlying musculo-skeletal problems. Plaintiff's hygiene and grooming were fair, eye contact was fair, thought process was organized, attitude was cooperative, insight and judgment were "partial," there was no evidence of delusions, paranoia, distortions, obsessions, or phobias. "Perception negative for delusions or hallucinations." Her memory was intact, she was alert and oriented times four, her attention and concentration were intact, she

---

[4]Delirium tremens is a severe form of alcohol withdrawal that involves sudden and severe mental or nervous system changes.

was verbal and able to communicate her needs. "[M]ood was described as crappy."

Plaintiff reported engaging in volleyball, exercise by doing squats and sit-ups, fishing, getting together with friends and family, shopping, eating out, and partying with friends. She does these leisure activities once or twice a day. When asked if she makes friends easily, plaintiff said, "yes." She considered herself a social person but also a person who prefers being alone.

Plaintiff was discharged two days later. On discharge, "there was no evidence of psychosis, depression, or mania". Discharge diagnoses were:

| | |
|---|---|
| Axis I: | Alcohol withdrawal |
| | Alcohol dependence |
| | History of cocaine abuse |
| | Rule out anxiety disorder secondary to alcohol abuse |
| Axis II: | No diagnosis |
| Axis III: | No ongoing medical problems |
| Axis IV: | Moderate stressors |
| Axis V: | GAF on admission 30, on discharge 50-60 |

She was prescribed Antabuse[5] and Vistaril[6] for anxiety. She was directed to have "no drugs or alcohol" and was referred to a substance abuse program. She was also told to find a therapist/counselor and a psychiatrist, and family therapy with her boyfriend was recommended.

About two months later, on March 19, 2008, plaintiff returned to St. John's complaining of back pain (Tr. at 258-261). Plaintiff reported that she had been smoking

---

[5]Used as part of a treatment plan for problem drinking. Creates an unpleasant reaction when drinking alcohol, which reduces the desire to drink. This medicine is part of a recovery program that includes medical supervision and counseling.

[6]A sedating antihistamine.

methamphetamine. She was experiencing nausea, heart palpitations, and acute back pain. Her habits included alcohol, tobacco, cocaine and amphetamines. She denied any social concerns. Her physical exam was normal except her heart had a regular rate and rhythm but with extra beats and she had tenderness in her back. Plaintiff was offered a referral to inpatient/outpatient drug abuse treatment but she declined. She was encouraged to stop using methamphetamine and was told that using meth puts her at increased risk of heart attack and death.

About four months later, on July 28, 2008, plaintiff returned to St. John's emergency room with a chief complaint of high blood pressure (Tr. at 252-257). She had no history of hypertension and thought her high blood pressure was due to anxiety. It was 170/130 when she took it herself (120/80 is normal). She reported no social concerns. Habits included regular use of alcohol, regular use of tobacco (one pack per day), and regular use of methamphetamine, although she reported having not used drugs for one week. Her exam was entirely normal. Her lab work was unremarkable. Her blood pressure when taken in the emergency room was normal (Tr. at 255). She was discharged in stable condition.

On August 6, 2008, plaintiff went to Freeman Health System complaining of vomiting and dental pain (Tr. at 298-301). Plaintiff's mood and affect were normal. She reported smoking a half a pack of cigarettes per day. She was assessed with sinusitis and toothache and was given antibiotics, a non-steroidal anti-inflammatory, and another illegible medication.

On August 7, 2008, plaintiff presented to Freeman Hospital with increased anxiety and reports that her medications were making her feel "high" and itchy (Tr. at 294-297). She was taking Keflex (antibiotic), Naprosyn (non-steroidal anti-inflammatory), and Panlor (analgesic for pain). She was a smoker and denied any past medical or surgical history. She reported crying episodes and increased anxiety since starting the Panlor the night before. She said she was in alcohol rehab, and she was noted to have shaky hands. Her psychological exam was normal except she had mild anxiety. She was discharged in unchanged but stable condition and told to follow up with her primary care physician.

Almost 14 months later, on September 30, 2009, plaintiff went to Freeman Urgent Care and reported anxiety (Tr. at 281-284). She reported having an appointment the following month with a psychiatrist at Ozark Center for anxiety and she needed to be started on anxiety medication. She was on no medication at the time. She reported difficulty concentrating, worrying a lot, difficulty sleeping. She continued to smoke. Her physical and mental examinations were normal, and it was noted that she had no delusions or hallucinations. She was assessed with generalized anxiety disorder, prescribed Lorazepam (20 pills), and told to make an appointment with her primary care physician as soon as possible.

On October 7, 2009, plaintiff saw Dr. Gallemore to re-establish care (Tr. at 232). She reported having recently been prescribed Lorazepam by an emergency room physician. She was alert and oriented times three. A thorough exam was not performed. Plaintiff was assessed with anxiety disorder by history, panic disorder by

history, depression by history, and medical noncompliance by history.  She was prescribed Lorazepam for anxiety; however, Dr. Gallemore wrote, "I will not allow this patient to reestablish care at this facility due to the fact that she was noncompliant in the past with my recommendations."

On November 10, 2009, plaintiff was seen at the Freeman Health System emergency room complaining of anxiety and paranoia (Tr. at 340-342).  She noted that she had had an appointment at the Ozark Care Center but that she had not gone.  She was on no medications.  She was a current smoker and an "occasional" user of alcohol, and she said that she "used to" use drugs.  She appeared anxious but had a normal mood and affect.  She was prescribed Ativan for anxiety.

Plaintiff was seen at the Freeman Health System emergency room on November 14, 2009, complaining of head pain, neck pain and shoulder pain after getting into a fight the night before (Tr. at 336-339).  "Pt appears drunk."  A history of depression was noted.  Her back was nontender with normal range of motion.  X-rays of her neck were normal.  She was assessed with myofascial strain of the neck and depression, and she was told to follow up with "outpatient" to which plaintiff indicated she already had an appointment.

On Monday, December 28, 2009, plaintiff was seen at the Freeman Health System emergency room reporting increased anxiety and trouble breathing (Tr. at 332-335).  She was not taking any medications at the time.  Plaintiff described racing thoughts, inability to sleep, confusion, forgetfulness, "going nuts."  She said it "flared up" Saturday night, and the health care provider wrote, "Why?"  Regarding her substance

abuse, plaintiff indicated that she was a smoker, an occasional user of alcohol and that she "gets drunk," and under drugs, there was some discussion of "meth" but most of the entry is illegible.  She said she had tried her boyfriend's Seroquel[7] but it only made her sleep and she was told it is quite expensive. She was diagnosed with anxiety, prescribed medication, and told to schedule an appointment with a therapist.

On February 9, 2010, plaintiff saw Theresa Shope, a nurse practitioner, at the Ozark Center for a psychiatric evaluation (Tr. at 351-354).  "'I've been struggling w/anxiety, I get confused & have panic attacks, muscle tension agitation, fatigue, irritability, feelings of disorganization, decreased memory, fatigue, muscle aches, racing thoughts.'  Reports history of heavy meth use & moderate cocaine use.  'I haven't been the same since.'  Reports unable to relate to people or keep a steady job secondary to mood problems."  She reported Seroquel as a current medication and said that it had been given to her at an urgent care treatment center.  "I got Klonopin - but they're all gone.  Haven't had any for a month."  Plaintiff said that she "overdid the meth" and does not think she has been the same since.

Ms. Shope observed that plaintiff was clean, oriented times three, goal directed, mildly disorganized.  Her speech was clear, hesitant and verbose.  She had good insight and judgment, "denies chronic paranoia."  She was assessed with the following:

Axis I:       Mood disorder due to methamphetamine, cocaine, alcohol
              dependence/abuse
              Meth & cocaine dependance in full sustained remission
              Alcohol dependence in partial sustained remission

---

[7]Treats schizophrenia and bipolar disorder.

```
                          Post traumatic stress disorder
                          Anxiolytic (prescription anti-anxiety medication) dependence
          Axis II:        Personality disorder not otherwise specified
          Axis III:       None reported
          Axis IV:        Mood
          Axis V:         GAF 45[8]
```

Ms. Shope prescribed Doxepin (treats depression, anxiety, and sleep disorders)

and Seroquel (treats schizophrenia and bipolar disorder) and instructed plaintiff to

schedule an appointment with a therapist and return for a follow up in one month.

Two days later, on February 11, 2010, plaintiff applied for disability benefits.

On April 13, 2010, plaintiff saw Alan Ramsey, M.S., at Healing the Family

Center at the request of Newton County Family Support Division (Tr. at 375-376).

Crystal has panic reactions in crowds with symptoms of tremors, hyperventilation, dizziness and overwhelming desire to flee. She has been to Freeman Urgent Care with her symptoms which include a phobic type belief that she "stinks". She has been placed on Zyprexa, Prozac, and Vistaril. With the Vistaril, she sleeps well, but without it she is troubled by racing thoughts. Even with the medication, however, she is distractible and absent minded, even losing or misplacing objects and making mistakes such as leaving the oven on. In addition to her phobias, she describes a delusional process and sometimes believes there are "hidden cameras" on her. Most delusions have paranoid characteristics.

In 2005 with the death of her mother, Crystal became addicted to methamphetamine for two or three years. She claims to be abstinent now.

* * * * *

Mental Status Examination. Crystal was disheveled in appearance . . . and exhibited adequate personal hygiene. Facial expression were normal and eye contact was adequate. She was a cooperative individual who related well with

---

[8]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

16

examiner.  There were no bizarre or unusual gestures or mannerisms other than tremors of the hands and in her voice.  She appeared to be experiencing an anxious mood, which seemed to be severe. . . .  She appeared to be psychotic, exhibiting symptoms of a thought disorder to include delusions, derailments, flight of ideas, obsessions, and phobias. . . .  Crystal was administered an extended Mental Status Exam to assess her attention, memory, language, and higher cognitive functioning.  Her ability to attend to a task does appear to be impaired.

Mr. Ramsey found that plaintiff had an adequate ability to sustain attention for extended periods of time.  Mental control was adequate.  She demonstrated poor new learning ability, her remote memory was impaired.  Her speech and verbal fluency were normal.  Social judgment skills were lacking "as she could respond correctly to only one of the five questions of a social judgment nature."

Plaintiff reported being phobic about "even small crowds."  She described delusional thinking about hidden cameras and thoughts that she stinks.  Plaintiff reported staying at home most of the time, depended on her "cohabitant" and that she has a low level of functioning with housework due to her "distractedness."

Mr. Ramsey assessed the following:

| | |
|---|---|
| Axis I: | Panic disorder with agoraphobia |
| | Delusional disorder, mixed type |
| Axis II: | None |
| Axis III: | None |
| Axis IV: | Problems related to the social environment:  occupational problems, problems with access to healthcare services |
| Axis V: | GAF - 40 |

"Due to the symptom severity, I find this individual does meet the criteria for medical assistance from the state."

On April 21, 2010, Steven Akerson, Psy.D., a non-examining physician, reviewed plaintiff's medical records (Tr. at 359-370). He found that plaintiff had medically determinable impairments of mood disorder due to methamphetamine, cocaine and alcohol dependence; posttraumatic stress disorder; personality disorder not otherwise specified; and alcohol dependence, methamphetamine dependence, cocaine dependence, and anxiolytic abuse. He found that plaintiff suffers from mild restriction of activities of daily living; mild difficulties in social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no repeated episodes of decompensation. In support of his findings, Dr. Akerson described in detail all the records above including plaintiff's substance abuse, noncompliance, and medical records describing mild symptoms.

Dr. Akerson completed a Mental Residual Functional Capacity Assessment on the same day, finding that plaintiff is not significantly limited in the following:

- The ability to remember locations and work-like procedures

- The ability to understand and remember very short and simple instructions

- The ability to carry out very short and simple instructions

- The ability to maintain attention and concentration for extended periods

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to sustain an ordinary routine without special supervision

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to make simple work-related decisions

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to interact appropriately with the general public

- The ability to ask simple questions or request assistance

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to respond appropriately to changes in the work setting

- The ability to be aware of normal hazards and take appropriate precautions

- The ability to travel in unfamiliar places or use public transportation

- The ability to set realistic goals or make plans independently of others

He found that plaintiff is moderately limited in the following:

- The ability to understand and remember detailed instructions

- The ability to carry out detailed instructions

(Tr. at 371-373).

On May 1, 2010, plaintiff presented to the Emergency Room at St. John's Medical Center with a chief complaint of, "I have paranoia" (Tr. at 412-417). Plaintiff had no primary care physician. She said she was on Zyprexa, Prozac and Vistaril but last took those "a few days ago."

Plaintiff's physical exam was normal. "She is trying to pursue disability. She said she was unable to work due to concentration problems and paranoia." She had fair

hygiene and grooming.  Her speech was organized with normal rate and tone.

Language was intact, thought process was organized, insight/judgment was marginal,

she was oriented times four, her long and short term memory were intact.  She

described paranoia but denied hallucinations, her mood was nervous, affect was

anxious, and concentration was "impaired, has difficulty spelling circle backwards."

> Reason for hospitalization/hospital course:  This patient is a 29-year-old Caucasian female with a long history of substance abuse.  She presented to the emergency room complaining of severe apparent paranoia.  She thought people were trying to poison her and were watching her.  She was intoxicated with a blood alcohol level of 0.26.

> Patient reported having paranoia off and on over the last year.  She showers numerous times during the day because she has fear/obsessions that she smells badly. She denied suicidal thoughts, auditory or visual hallucinations.

> As above, the patient has a long history of addiction. She has been addicted to methamphetamine and alcohol.  She claims that this is the first time she had drank in about a week.  I am not sure how reliable her report was.  She claimed to have been clean from drugs for about a year.  She does see a nurse practitioner at the local mental health center who has treated her with Zyprexa, Prozac and Vistaril.

> Plaintiff was hospitalized from May 1 to May 4, 2010.  During that time she was

involved with various group activities.

> Diagnostically, it is not clear exactly what is going on here. . . .  Regardless of the diagnostic issues, will treat symptoms.  I will start her on Haldol for psychosis, Paxil for a possible obsessive-compulsive disorder, and BuSpar for obsessive-compulsive disorder/anxiety.  I have told her I will not be prescribing anything addictive due to her history of addictions.  I have spent time discussing the need to abstain from alcohol and drugs due to their factors in her current symptoms.

Tamon Paige, M.D., anticipated that plaintiff would need four to six day in the hospital

for treatment, but she was discharged after three.

She did try to push boundaries of her paranoia. She thought that she was being monitored closely, definitely was delusional. She did not fit classic symptoms of schizophrenia. She did not have a flat affect. It was unclear diagnostically what was causing her psychosis. . . .

Regardless of these diagnostic issues, her mood did improve. She showed no alcohol withdrawal. Her paranoia improved slightly. On 05/04/2010, she was demanding to be discharged. There was no reason to commit her.

The following day, on May 5, 2010, plaintiff saw Theresa Shope at the Ozark Center for follow-up (Tr. at 400-401). Plaintiff told Ms. Shope, "I was in the Hawthorn Center over the weekend after I had a time of some kind of breakdown." Plaintiff admitted she had used alcohol over the weekend and had run out of her Prozac and Zyprexa. Although she was prescribed Haldol in the hospital, she told Ms. Shope she was not going to take it because it made her jaw and neck muscles tighten. "Requests that she start back on her Zyprexa. Patient also requests Vistaril for her anxiety. Reports that she had gone to an urgent treatment center earlier in the month and had been given that for anxiety and would like to continue taking that."

Plaintiff's energy and motivation were fair, she was sleeping ok, and she denied audio or visual hallucinations. On exam she was alert and oriented, goal directed, clean and casual. She had a mildly anxious mood and affect. "Patient insistent that she be ordered a benzodiazepine such as Klonopin or Xanax. Discussed addictive potential of these medications as well as patient's history of polysubstance dependence. Discussed at this time would not feel that it would be in the patient's best interest to order these medications." Plaintiff was continued on Paxil (treats depression), her Prozac (treats depression) was discontinued, BuSpar (treats anxiety)

was discontinued, Cogentin (treats side effects of psychiatric drugs) was added and Vistaril (a sedating antihistamine, prescribed for anxiety) was added. "Since patient refusing Haldol will resume Zyprexa (both treat schizophrenia). Encouraged patient to schedule with therapist. Continue with primary care provider as needed."

On June 4, 2010, plaintiff saw Dr. Robert Sweeten at Seneca Medical Center to establish care (Tr. at 386). She reported anxiety and an abscess on her molar. Dr. Sweeten referenced plaintiff's medications; however, it is unclear by this very brief record whether he noted she was taking them or whether he refilled them, etc.

On July 14, 2010, Mr. Ramsey (the psychologist who examined plaintiff on April 13, 2010, in connection with her application for state benefits), completed a Medical Source Statement Mental for plaintiff's Social Security disability case (Tr. at 378-379). He had not seen plaintiff other than for the one exam three months earlier. Mr. Ramsey found that plaintiff was not significantly limited in the following:

- The ability to carry out very short and simple instructions

- The ability to interact appropriately with the general public

- The ability to ask simple questions or request assistance

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to respond appropriately to changes in the work setting

- The ability to be aware of normal hazards and take appropriate precautions

- The ability to travel in unfamiliar places or use public transportation

He found that plaintiff was moderately limited in the following:

- The ability to remember locations and work-like procedures

- The ability to understand and remember very short and simple instructions

- The ability to carry out detailed instructions

- The ability to sustain an ordinary routine without special supervision

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to make simple work-related decisions

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to set realistic goals or make plans independently of others

He found that plaintiff was markedly limited in the following:

- The ability to understand and remember detailed instructions

- The ability to maintain attention and concentration for extended periods

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

On July 28, 2010, plaintiff saw Theresa Shope for a follow up (Tr. at 399). "Not taking the Cogentin because it caused me to be dizzy, otherwise the medicine is helping a lot." Plaintiff reported that her appetite, sleep, energy and motivation were all good. She denied audio or visual hallucinations. She was alert and oriented times three, goal directed, clean and casual. She had a euthymic (normal) mood and affect.

Ms. Shope gave plaintiff prescriptions for refills of her medications and told her to return in five months.

On September 14, 2010, plaintiff went to Freeman Ear, Nose & Throat Center for her tooth abscess and was noted to have a normal ability to communicate (Tr. at 383).

Plaintiff saw Dr. Sweeten on October 1, 2010, for medication refills, and she asked him to complete Medical Source Statements for her disability case (Tr. at 393-397, 422). In the Medical Source Statement Physical, Dr. Sweeten made the following findings: She could lift 15 pounds frequently and 20 pounds occasionally, stand or walk for three hours at a time and for a total of six hours per workday, sit for two hours at a time and for six hours per workday, and she had an unlimited ability to push or pull. She could occasionally balance, climb and stoop, but had no other postural or manipulative limitations. She should avoid concentrated exposure to extreme temperatures, weather, wetness, humidity, dust, fumes, and vibration. She should avoid any exposure to hazards and heights. He noted that plaintiff's use of Klonopin causes a "decrease in concentration, persistence, or pace, or other limitations."

In the Medical Source Statement Mental, Dr. Sweeten found that plaintiff was moderately limited in the following:

- The ability to remember locations and work-like procedures
- The ability to understand and remember very short and simple instructions
- The ability to carry out very short and simple instructions
- The ability to sustain an ordinary routine without special supervision
- The ability to make simple work-related decisions

- The ability to interact appropriately with the general public

- The ability to ask simple questions or request assistance

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

He found that plaintiff was markedly limited in the following:

- The ability to understand and remember detailed instructions

- The ability to carry out detailed instructions

- The ability to maintain attention and concentration for extended periods

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to respond appropriately to changes in the work setting

- The ability to be aware of normal hazards and take appropriate precautions

- The ability to travel in unfamiliar places or use public transportation

- The ability to set realistic goals or make plans independently of others

Plaintiff saw Dr. Sweeten on November 4, 2010, and reported headaches behind her eyes with light sensitivity (Tr. at 421); on November 18, 2010, reporting numbness on the right side of her neck and down the right side of her body (Tr. at 420); on

November 25, 2010, reporting tightness in her shoulder off and on (Tr. at 419). Dr. Sweeten did not perform any exams on those visits, and his records, which consist of only a few words, are illegible.

## C.    SUMMARY OF TESTIMONY

During the November 29, 2010, hearing, plaintiff testified; and Cynthia Younger, a vocational expert, testified at the request of the ALJ.

### 1.    Plaintiff's testimony.

Plaintiff was asked what happened on December 1, 2006, her alleged onset date (Tr. at 31). "I was working at Readings Mill Inn, and . . . I just felt overcrowded, and dizziness, and shakiness, and, like, feeling I was going crazy or something, and I didn't know what it was, and I realized that it was anxiety. I do believe that at that time, it -- my mom passed away in 2005, and I think maybe that's what caused me to use methamphetamines, which is not no excuse, but I do, for -- believe that it has caused some damage to me." (Tr. at 31). Plaintiff cannot remember if she was at work that day (Tr. at 31).

Subsequent to her alleged onset date, plaintiff worked at Wendy's for a few months (Tr at 32). She quit there in approximately October or November 2009 (Tr. at 32). Plaintiff was a sandwich maker, a runner for the drive-through (Tr. at 32). She left that job "because of anxiety, and weird fears and phobias" (Tr. at 32, 35). She has a fear of cameras and a fear of embarrassing body odor (Tr. at 33). When asked to elaborate on her fear of cameras, given the closed-circuit television at the Wendy's drive-through, plaintiff said, "Well, I knew that was there. I just think other things are

cameras that don't exist, but I, I don't know. It's embarrassing." (Tr. at 33). Plaintiff never worked more than 32 hours a week (Tr. at 35).

Plaintiff started using methamphetamine shortly after her mom's death on May 22, 2005 (Tr. at 33). She last used it in 2007 or 2008 (Tr. at 33). She last used cocaine two or three years ago (Tr. at 33). Plaintiff continues to have a drink or two occasionally (Tr. at 34). When asked about her blood alcohol content when she admitted herself into the hospital, plaintiff said that she only has a drink once or twice a year, but "[t]hat day, I was having really bad fears and phobias, so I did drink a little bit, knowing that I'm not supposed to drink on my medication." (Tr. at 47). She does not remember whether she was out of her medications at the time she went into the hospital (Tr. at 47). She has felt the same level of paranoia once or twice since her hospitalization, but she deals with it (Tr. at 48).

Plaintiff does not know what the diagnosis of anxiolytic abuse is from -- she takes her anti-anxiety medication as prescribed (Tr. at 34). She started having trouble with anxiety in 2005, but she did not realize what it was until 2006 (Tr. at 36). Plaintiff believes that her methamphetamine use has caused memory problems, paranoia, anxiety and nerve damage (Tr. at 37). "[F]or instance, I'll think like a DVR or something has a camera in it or something silly [inaudible] has a camera in it. Like, right now, I know I'm on camera, but, like, little objects. It's, it's just -- and everybody tells me they're delusions, and I know they're delusions. I don't hear voices or see things, but it, it messes with me. That's why I can't go in public." (Tr. at 37). Dates are hard for plaintiff to remember, sometimes she forgets her phone number or zip code, she will

forget what color glass she is using, and she forgets where she puts things (Tr. at 43-44).

Plaintiff goes outside of the house every day to smoke cigarettes and feed the dogs or to get fresh air (Tr. at 41). She is able to care for her personal needs, and occasionally she showers two or three times a day due to her phobias (Tr. at 41). Two to four times a week, plaintiff has anxiety attacks when she has "the phobia of the camera people watching me" and then she rarely leaves her room (Tr. at 42). On those days, she does go outside to smoke, but then she goes right back to her room (Tr. at 43).

Plaintiff dropped out of school in 11th grade (Tr. at 35). She tried to get a GED but she didn't -- "I got with my daughter's dad, and -- which is no excuse, but -- being young and dumb." (Tr. at 35).

Plaintiff lives with her husband, his uncle, and the uncle's step son (Tr. at 39-40). Plaintiff has a nine-year-old daughter whom she sees on the weekends (Tr. at 40). Plaintiff lives on ten acres (Tr. at 40). She tries to help feed the family's five dogs (Tr. at 40-41). Plaintiff does not mow because she does not know how -- she was taught by her mother that girls do the inside work and boys do the outside work (Tr. at 41). Laundry is hard for her because she is confused and scatterbrained (Tr. at 44).

Plaintiff has a driver's license (Tr. at 34). She drives her husband home from work, to her appointments, to the store (such as Wal-Mart), or to do things for her daughter (Tr. at 34, 44). If her anxiety is too high, she does not drive (Tr. at 34). When plaintiff goes to Wal-Mart, sometimes her husband and his uncle go with her (Tr. at 45).

28

"I'll make a list, and I'll, you know, get in Wal-Mart. And sometimes, I can make it

through the line, and have to leave before I can cash out; and sometimes, I just have to

leave in the middle of it, and they have to finish, and I sit in the car." (Tr. at 45). When

plaintiff gets up in the mornings, she feels disoriented; but then she looks around the

house to see what needs to be done (Tr. at 42). She lets the dogs out, eats, and

watches television, but she "phases off" into her own world a lot (Tr. at 42).

Plaintiff has panic attacks at least once a day (Tr. at 45). They typically last 20 to

45 minutes (Tr. at 45). She shakes and has choking sensations (Tr. at 45). When

plaintiff worked at Wendy's she would make the same sandwich more than once, she

would get "totally lost" and confused, and her boss would have to come take over for

her (Tr. at 46). Her anxiety keeps her from going out to get her nails done and get her

hair done, she cannot go out on dates, she cannot go to functions with her daughter

(Tr. at 46).

Plaintiff is not taking any pain medication (Tr. at 35). She had an x-ray of her

cervical spine in 2006 due to a pinched nerve, and she takes Flexeril for that (Tr. at 35-

36). Plaintiff was diagnosed with a pinched nerve a week before the hearing (Tr. at 37).

It causes her right arm to go numb (Tr. at 38). She takes Zyprexa, Paxil, and Klonopin

for her anxiety disorder (Tr. at 36). She was also prescribed Cogentin, BuSpar, and

Hydroxyzine (Tr. at 37). Plaintiff's medication makes her drowsy and dizzy, she has a

dry mouth, and she has numbness a lot (Tr. at 37). She also has memory loss (Tr. at

37).

**2.    Vocational expert testimony.**

Vocational expert Cynthia Younger testified at the request of the Administrative Law Judge.  The first hypothetical involved a person capable of a full range of work at all exertional levels but is limited to occasional postural maneuvers, such as balancing, stooping, and climbing.  The person is limited to simple, routine, repetitive tasks not performed in a fast-paced production environment, involving only simple work-related decisions and, in general, relatively few workplace changes.  The person is limited to occasional interaction with supervisors, coworkers and the general public, and is limited to occupations which do not require travel to unfamiliar locations.  The person is limited to occupations which do not require exposure to dangerous machinery and unprotected heights (Tr. at 49, 50).  The vocational expert testified that such a person could perform plaintiff's past relevant work as a sandwich maker (Tr. at 49, 50).  The person could also work as laundry worker, with 1,250 jobs in Missouri and 97,500 in the country; dining room attendant, with 3,600 in Missouri and 125,000 in the country; injection mold tender, with 1,200 in Missouri and 78,000 in the nation; or an inserting machine operator, with 1,510 in Missouri, and 75,500 in the country (Tr. at 50).

The second hypothetical involved a person who is limited to light work; may occasionally balance, stoop, crawl, and climb; is limited to occasional overhead reaching with the right dominant extremity; limited to occupations which do not require exposure to dangerous machinery and unprotected heights; limited to simple, routine, repetitive tasks not performed in a fast-paced production environment, involving only simple work-related decisions and in general relatively few workplace changes; is

limited to occasional interaction with supervisors, coworkers, and the general public; and is limited to occupations which do not require travel to unfamiliar places (Tr. at 51). The vocational expert testified that such a person could not do any of plaintiff's past relevant work; however, the person could work as an injection mold machine tender or inserting machine operator (Tr. at 51). The person could also work as a collator operator, with 1,450 in Missouri and 72,500 in the country (Tr. at 51).

Employers usually tolerate one sick day per month (Tr. at 52). Most employers tolerate being off task 10 percent of the time (Tr. at 52). If a person needs more than the normal 15-minute break mid-morning and mid-afternoon and half hour lunch break, the person could not work (Tr. at 53).

## V.    FINDINGS OF THE ALJ

Administrative Law Judge James Harty entered his opinion on March 17, 2011 (Tr. at 10-21). Plaintiff's last insured date was September 30, 2010 (Tr. at 12).

Step one. Plaintiff has not engaged in substantial gainful activity since her alleged onset date (Tr. at 12). She worked after this date but her income did not rise to the level of substantial gainful activity (Tr. at 12).

Step two. Plaintiff has the following severe impairments: mood disorder secondary to methamphetamine, cocaine, and alcohol dependence; post traumatic stress disorder; personality disorder; alcohol dependence; methamphetamine dependence; cocaine dependence; anxiolytic abuse; panic disorder with agoraphobia; delusional disorder mixed type; degenerative disc disease of the cervical spine;

psychosis possibly substance induced; anxiety disorder; depression; and degenerative joint disease of the left ankle (Tr. at 12-13).

Step three.  Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 13).

Step four.  Plaintiff has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations:  she is limited to occasional postural maneuvers such as balancing, stooping, and climbing and is limited to occupations that do not require exposure to dangerous machinery and unprotected heights.  She is limited to simple, routine, repetitive tasks not performed in a fast-paced production environment involving only simple, work-related decisions and in general relatively few workplace changes.  She is limited to occasional interaction with supervisors, co-workers, and the general public.  She is limited to occupations which do not require travel to unfamiliar places (Tr. at 15).

Plaintiff has no past relevant work  (Tr. at 20).  Although the vocational expert considered plaintiff's work as a sandwich maker to be past relevant work, she earned income at the substantial gainful activity level from more than one employer; therefore, because there is some uncertainty about whether plaintiff earned enough money from her job as a sandwich maker, the ALJ considered plaintiff to have no past relevant work (Tr. at 20).

Step five.  Plaintiff was 26 years of age, which is a younger individual, on her alleged onset date (Tr. at 20). She has limited education and can communicate in English (Tr. at 20).  Plaintiff is capable of performing other jobs in significant numbers in

the economy, such as laundry worker, dining room attendant, injection mold machine tender, and inserting machine operator (Tr. at 20-21). Therefore, plaintiff is not disabled (Tr. at 21).

## VI.    CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible. Specifically, she points out the following subjective allegations and argues that the ALJ erred in not finding them credible because engaging in housework "in no way directs a finding that she is able to engage in work," doing well for purposes of a treatment program is not related to her ability to work, and her allegations are consistent with the medical records of Mr. Ramsey and Ms. Shope.

Here, Darnell-Ogle testified that she stopped working because she was having panic attacks at work. She also conceded that she started using meth and cocaine after her mother passed away in 2005, but she had not used drugs in two or three years. Darnell-Ogle reported side effects from her medications, including drowsiness, dizziness, and dry mouth. She testified that she does have a driver's license but does not drive very much due to her anxiety. She stated she sometimes drove to her doctor appointments, or to pick her daughter up from school. Darnell-Ogle testified that she tried to do some household chores and would sometimes watch television during the day, but she was not able to focus on a full show. She stated that she sometimes went grocery shopping, but has had to leave the store before she finished because of her anxiety and panic attacks. She also testified that she would get easily confused when working at Wendy's because she could not understand the order screen like she was supposed to. Darnell-Ogle reported that she has panic attacks daily, at least one per day, and that an average panic attack lasted between twenty and forty-five minutes. She also endorsed delusions, including a belief that there were small cameras watching her, and she stated this made it difficult for her to leave her home.

Darnell-Ogle's testimony is consistent with her reports to Social Security when she applied for benefits, and it is also consistent with the medical evidence. On her function report, which she completed February 17, 2010, Darnell-Ogle indicated that she often isolated herself in her room if she was having a bad day

with anxiety, and she had crying spells when she would mess up simple tasks. She reported that she did some chores when her anxiety was not as bad, but stated that since her conditions had worsened, she was not as organized and had more difficulty keeping up with simple chores and cooking. She also stated that her sleep habits were affected by her medications, and she took several showers because she always believed she had an odor. Darnell-Ogle reported that she could complete household chores, but stated that sometimes it took her longer because she needed breaks or her anxiety would flare and she would isolate herself in her room. She also noted that she needed help with the household chores because every day was a battle with her anxiety and panic.

Darnell-Ogle indicated that she rarely left the home along because she felt like people were watching her and she did not like driving because of her nerves. When she did go shopping, Darnell-Ogle reported that she sometimes had to leave the store due to her anxiety and someone would have to finish the shopping for her. She stated that she spent time with her daughter, but did not go many places with her due to anxiety and how easily she became confused.

## A.      CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the

Commissioner to decide, not the courts.  Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir.

1988);  Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).  If there are

inconsistencies in the record as a whole, the ALJ may discount subjective complaints.

Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303

(8th Cir. 1993).  The ALJ, however, must make express credibility determinations and

set forth the inconsistencies which led to his or her conclusions.  Hall v. Chater, 62 F.3d

220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992).  If an

ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the

court will defer to the ALJ's judgment unless it is not supported by substantial evidence

on the record as a whole.  Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion, and additionally states that the following factors should be considered: Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

> The claimant alleges she is disabled by her impairments, primarily her anxiety, but the medical evidence, including treatment notes, do not support the degree of limitation alleged. The claimant's compliance with treatment has been limited. She sought medications from a physician in October of 2007 and did not return for follow up until October 2009 at which time she was not permitted to reestablish care. The claimant was prescribed medication through visits to the emergency room before she finally sought mental health treatment in February 2010. This pattern of treatment reflects brief exacerbations associated with substance abuse followed by rapid recovery with treatment. The claimant's

allegations of memory difficulties and confusion are credited insomuch as they support a limitation to simple, routine, repetitive tasks not performed in a fast-paced production environment involving only simple, work-related decisions and in general relatively few workplace changes. The undersigned has considered the claimant's anxiety and finds [she] is limited to occasional interaction with supervisors, co-workers, and the general public as well as to occupations which do not require travel to unfamiliar locations. To the extent the claimant alleges she is more limited, her allegations are not consistent with her rapid recovery with treatment.

* * * * *

The undersigned has considered the claimant's activities of daily living in assessing her credibility. . . .  Though the claimant testified she experiences side effects from her medications, the record reflects that when the claimant seeks treatment, her providers adjust her medications to reduce these side effects. The undersigned has considered the claimant's use of medication and other treatment, but does not find this factor enhances the credibility of the claimant's allegations.

The record reflects a significant amount of substance abuse. The claimant is not disabled even considering her substance abuse. Thus, the claimant's substance abuse is not a factor material to a determination of disability. Nonetheless, the claimant's substance abuse does not enhance her credibility. Despite her testimony at [the] hearing of disabling anxiety, the claimant rejected her treatment providers' recommendations of abstinence from substance abuse. Though the claimant reports current sobriety, her reports of sobriety for the past two to three years are not supported by the record. The claimant testified she only occasionally consumes alcohol in moderation, yet the record includes descriptions of heavier alcohol use.  In May 2010, the claimant was admitted to the hospital with a blood alcohol level of 0.26.  This inconsistency further detracts from the claimant's credibility.

(Tr. at 16-18).

## 1.     *PRIOR WORK RECORD*

Plaintiff has a history of low or no annual earnings even before her alleged onset date, suggesting a lack of motivation to work.

## 2.    DAILY ACTIVITIES

Plaintiff argues that her inability to focus on an entire television show supports her subjective allegations of disability.  The ALJ analyzed plaintiff's allegations by comparing them to the medical records.  In this case, there is no mention of a problem with concentration until plaintiff made that allegation on September 30, 2009 -- nearly three years after her alleged onset date.  In the meantime, on January 5, 2008, the doctors at Hawthorne noted that her attention and concentration were intact.  In September 2009, despite plaintiff's allegation, her mental exam was normal.  On April 21, 2010, Dr. Akerson, a non-examining doctor, found that plaintiff was not significantly limited in her ability to maintain attention and concentration for extended periods.  He relied on plaintiff's treatment records in support of his findings.

On May 1, 2010 -- 2 1/2 months after plaintiff had applied for disability benefits -- she alleged at St. John's that she was unable to work due in part to concentration problems.  Her concentration was noted to be impaired because she could not spell the word "circle" backward.

On July 14, 2010, Mr. Ramsey, who evaluated plaintiff one time three months earlier in connection with her application for government benefits and not for treatment, found that plaintiff was markedly limited in her ability to concentrate for extended periods.  Yet his record of the exam from three months earlier contains the notation that plaintiff had an adequate ability to sustain attention for extended periods of time.  Also on the day Mr. Ramsey interview plaintiff, for the first time in this record, plaintiff claimed that she suffers from a delusional belief that there are cameras watching her.

On the only occasion in this record, she was noted to be disheveled.  All of this was in connection with her application for benefits and not for treatment of her symptoms.

On October 1, 2010, plaintiff's new treating physician, Dr. Sweeten, found that she is markedly limited in her ability to concentrate for extended periods.  Dr. Sweeten's records are incredibly brief, show that he never performed any examination and made no observations or findings, and the few words he wrote on each record are largely illegible.

The ALJ discussed all of the medical evidence before making his credibility finding.  He noted that plaintiff's report to Mr. Ramsey regarding her daily activities was more restrictive than even her testimony and surmised that plaintiff's exaggerations to Mr. Ramsey affected his assessment.  The ALJ also noted the brief treatment relationship with Dr. Sweeten before he completed the Medical Source Statement and the lack of any support for his findings in his treatment notes.

In her Function Report plaintiff stated that she does not need reminders to take care of personal needs or to take medication, she prepares her own meals daily, she does dishes, mops, vacuums, dusts, cleans the bathroom, washes clothes, folds laundry, and makes her bed.  She goes outside to smoke cigarettes or if she has to go somewhere.  She rides in a car; she cannot go out alone because she feels like people are watching her.  "Right now I do not drive because I do not have a valid driver's license".  She is able to shop in stores once a week, but she does it as quickly as possible.

Plaintiff points out her testimony that she is sometimes unable to get through the entire process of shopping.  However, she actually stated that sometimes her husband and his uncle go with her, and sometimes she cannot make it through the check-out line but has to leave and sit in the car while they finish paying.  If plaintiff's alleged agoraphobia were as bad as she claims, one would not expect her go to a Wal-Mart at all if her husband and his uncle were already going.  The fact that plaintiff goes to the store with family members instead of letting them do the shopping without her suggests that her ability to go out into crowded places is not as limited as she claims.

Although plaintiff points out that she testified she would easily get confused when working at Wendy's because she could not understand the order screen, the ALJ did not find that plaintiff was capable of performing that type of work.

Plaintiff alleges that she suffers from a delusional belief that there are small cameras watching her and that this made it hard for her to leave her home; however, as mentioned above, this allegation did not surface until 3 1/2 years after her alleged onset date and it was in connection with an application for government benefits and not in a treatment record.

### 3.  DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS

Plaintiff alleges daily panic attacks and frequent crying spells; however, the record does not support that.  Plaintiff first complained of panic attacks "for the past two weeks" on February 4, 2007.  On that visit, she described very excessive daily alcohol use for the past year and said she had cut down two weeks ago and stopped completely a week earlier.  She was treated for alcohol withdrawal.  The next complaint

of panic attacks came nine months later and at that time she was on no medication. Two years and three months passed before plaintiff again alleged panic attacks on February 9, 2010. Finally, she complained of panic attacks on April 13, 2010, in connection with her application for government benefits.

The only report of crying came on August 7, 2008, when plaintiff said she was having crying episodes since starting the Panlor the night before. Although plaintiff was noted to be tearful on occasion in this record, she never complained of this symptom to any treating physician and in fact denied depression on many occasions.

### 4.     PRECIPITATING AND AGGRAVATING FACTORS

The record establishes that the precipitating and aggravating factors are drug and alcohol abuse and failure to follow a prescribed course of treatment. Plaintiff has been told by her doctors to abstain from drugs and alcohol; however, substance abuse was almost always the reason for her seeking medical treatment. She repeatedly stopped taking her medication for whatever reason, she was not permitted to reestablish care with a physician due to noncompliance, she was told on numerous occasions to participate in therapy but never did, and she left a hospital prior to her treating doctor's recommendation after he told her he would not be prescribing the addictive medication she had hoped to get. She was offered substance abuse treatment and declined, she failed to show up for an appointment with a mental health provider, and despite being told on numerous occasions how her drug and alcohol abuse caused her symptoms she continued to abuse those substances.

5. **DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION**

As the ALJ stated in his order, the record establishes that when plaintiff sought treatment, her symptoms improved rapidly. When she took her medication as prescribed, her symptoms improved. The only side effects plaintiff alleges are drowsiness, dizziness, and dry mouth. Plaintiff never complained of drowsiness to any treating doctor. The only time she alleged dizziness was during her interview with Mr. Ramsey in connection with government benefits. Plaintiff has not explained how a dry mouth would cause her functional restrictions to be greater than those found by the ALJ.

6. **FUNCTIONAL RESTRICTIONS**

As discussed more in depth in the next section, the ALJ carefully weighed the functional restrictions found by each medical professional before determining plaintiff's residual functional capacity. The functional restrictions found by Dr. Sweeten and Mr. Ramsey are not deserving of much weight and therefore do not support plaintiff's credibility. The credible medical records contradict plaintiff's hearing testimony regarding her functional restrictions.

B. **CREDIBILITY CONCLUSION**

In addition to the above, I note that there are inconsistencies in the record which support the ALJ's decision to discredit plaintiff's testimony. On July 19, 2006, plaintiff reported to the doctor at St. Joseph that she had been using methamphetamine heavily; however, on January 5, 2008, she told the doctor at Hawthorne that she had no history of methamphetamine use. Just over two months later, plaintiff admitted using

methamphetamine and declined a referral for drug abuse treatment.  On July 28, 2008, her methamphetamine use was noted to be continuing.  Clearly she was not always honest when seeking medical treatment.  And as discussed above, plaintiff's descriptions of her symptoms and limitations were exaggerated when she was being examined in connection with her applications for government benefits when compared to her descriptions when seeking treatment.

Furthermore, impairments that are controllable or amenable to treatment do not support a finding of total disability. Pepper ex rel. Gardner v. Barnhart, 342 F.3d 853, 855 (8th Cir. 2003).  Plaintiff's medical records indicated her limitations were controllable with treatment. The treatment records show plaintiff's complaints of panic attacks and anxiety were preceded by her drinking alcohol or not taking her prescribed medications.  As soon as she sought treatment and stopped drinking alcohol (even if only temporarily), she "rapidly stabilized" and consistently "showed rapid improvement in her symptoms."

The ALJ also observed that plaintiff only sought sporadic treatment once her symptoms were severe.  As the ALJ noted, plaintiff went to the emergency room multiple times for treatment complaining of severe panic and anxiety, but she did not seek consistent care between emergency room visits.  Instead, she waited until her symptoms were severe again or she ran out of medication, and she then returned to the emergency room.

Plaintiff's misrepresentation regarding the amount of alcohol she drank further undermined her credibility with the ALJ.  She testified that she had a "drink or two" of

alcohol only "once to twice" a year, but her testimony conflicts with the evidence which establishes that she was regularly using alcohol. In <u>Karlix v. Barnhart</u>, 457 F.3d 742, 748 (8th Cir. 2006), the ALJ found Karlix unreliable because his testimony at the administrative hearing regarding his consumption of alcohol conflicted with medical documentation. This was a sufficient reason for discrediting Karlix, and the court deferred to the ALJ's judgment on that issue. See also 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4) (when evaluating a claimant's subjective testimony, an ALJ may consider whether there are conflicts between a claimant's statements and the rest of the evidence).

For all of these reasons, I find that the substantial evidence in the record as a whole supports the ALJ's decision to discredit plaintiff's subjective complaints of disabling symptoms.

## VII.    OPINIONS OF MR. RAMSEY AND DR. SWEETEN

Plaintiff argues that the ALJ erred in discounting the opinions of Mr. Ramsey and Dr. Sweeten in formulating plaintiff's residual functional capacity.

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques. <u>Reed v. Barnhart</u>, 399 F.3d 917, 920 (8th Cir. 2005); <u>Ellis v. Barnhart</u>, 392 F.3d 988, 998 (8th Cir. 2005). If the ALJ fails to give controlling weight to the opinion of the treating physician, then the ALJ must consider several factors to determine how much weight to give the opinion including length of the treatment relationship and the frequency of

examination; nature and extent of the treatment relationship; supportability, particularly

by medical signs and laboratory findings; consistency with the record as a whole; and

other factors, such as the amount of understanding of Social Security disability

programs and their evidentiary requirements or the extent to which an acceptable

medical source is familiar with the other information in the case record.  20 C.F.R. §§

404.1527, 416.927.

The ALJ had this to say about Mr. Ramsey and Dr. Sweeten:

Dr. Sweeten appears to be the claimant's current primary physician. Treatment records reflect a frequency of about once or twice a month.  However, the medical source statements are dated October 1, 2010, and the claimant's earliest record of treatment with Dr. Sweeten is June 4, 2010, just about four months earlier. Thus, the opinions of Dr. Sweeten are based on just six visits. Records from the date the forms were completed indicate the claimant was seen for a checkup and medication refills without any significant findings to support the opinion.  Dr. Sweeten does not identify a speciality, but does not appear to specialize in mental health treatment.  Thus, the undersigned has considered the relevant factors, but finds the opinion of Dr. Sweeten is entitled to only some weight due to the limited treatment relationship prior to the opinion and the lack of support from treatment notes. . . .

Alan Ramsey, M.S., a licensed psychologist, evaluated the claimant as part of her application for state assistance.  Mr. Ramsey opined the claimant met the criteria for medical assistance through the state.  While the criteria are not explicitly stated, Mr. Ramsey did assess a very low GAF score.  Mr. Ramsey subsequently completed a medical source statement with marked limitations in five areas including the ability to complete a normal workday or workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. The opinion of Dr. [sic] Ramsey is base[d] on a one-time evaluation and as noted above the report from the evaluation suggests a different description from the claimant as to her ability to leave her home than her testimony provided at her hearing.  For these reasons, the opinion of Mr. Ramsey is given little weight.

(Tr. at 18-19).

**Length of the treatment relationship and the frequency of examination.** As pointed out by the ALJ, plaintiff had been treated for only a couple of months by Dr. Sweeten and was never treated by Mr. Ramsey.

**Nature and extent of the treatment relationship**. Dr. Sweeten was plaintiff's new primary care physician at the time he completed the Medical Source Statement. Her visits to Dr. Sweeten did not always deal with her allegedly disabling impairments:

> 06/04/10 - looking for primary care physician, complains of anxiety, sore on gum line
> 06/17/10 - review TSH (thyroid stimulating hormone)
> 07/21/10 - sore on the gum line
> 07/24/10 - bronchitis
> 10/01/10 - check up, refills (this is the day the MSS was completed)
> 11/04/10 - Headaches behind eyes, sensitive to light
> 11/18/10 - numbness from right side of neck to toes
> 12/02/10 - follow up on Flexeril prescription, shoulder tightness, urination issues

Clearly the nature of the treatment relationship was not centered on plaintiff's mental impairments. Dr. Sweeten was a primary care physician, and he treated plaintiff's mouth sores, respiratory infections, headaches, and body aches and pains more than he treated her mental impairments. On only one visit did plaintiff ever name a mental condition as the reason for her visit.

**Supportability, particularly by medical signs and laboratory findings**. Neither Dr. Sweeten's nor Mr. Ramsey's findings are supported by medical signs or laboratory findings. Dr. Sweeten did not perform any tests, he did not list any findings or observations in his records, and the few words he wrote on each page are mostly illegible. Mr. Ramsey based his findings in part on his mental status examination (which is an interview of plaintiff). As mentioned above, his findings on the Medical

Source Statement are not entirely consistent with the record of his one visit with plaintiff.  During his interview, he observed that plaintiff had an adequate ability to sustain attention for extended periods of time, yet on his Medical Source Statement he found that she was markedly limited in her ability to maintain attention and concentration for extended periods.  And again, that one visit was in connection with her application for state government benefits rather than for treatment, and plaintiff exaggerated her symptoms during her interview with Mr. Ramsey.

**Consistency with the record as a whole.**  Neither of these Medical Source Statements are consistent with the record as a whole.  Beginning with a comparison of the findings of Dr. Sweeten and the findings of Mr. Ramsey, I note the following significant differences:

- Mr. Sweeten found that plaintiff is markedly limited in her ability to respond appropriately to changes in the work setting, while Mr. Ramsey found that plaintiff is not significantly limited in this ability

- Mr. Sweeten found that plaintiff is markedly limited in her ability to be aware of normal hazards and to take appropriate precautions, while Mr. Ramsey found that plaintiff is not significantly limited in this ability

- Mr. Sweeten found that plaintiff is markedly limited in her ability to travel in unfamiliar places or use public transportation, while Mr. Ramsey found that plaintiff is not significantly limited in this ability

Dr. Sweeten's extreme limitations are unrelated to any of his treatment notes and are likewise contradictory to plaintiff's years of medical records predating Dr. Sweeten's treatment of her.  For example, he found that she was moderately limited in her ability to remember very short and simple instructions.  However, on July 19, 2006, at St. John's her recent and remote memory were intact.  On January 5, 2008, at Hawthorne,

her memory was intact.  On April 13, 2010 -- in connection with her interview for government benefits -- her remote memory was noted by Mr. Ramsey to be impaired. However, two weeks later on May 1, 2010, at St. John's her short and long term memory were noted to be intact.

**Other factors, such as the amount of understanding of Social Security disability programs and their evidentiary requirements or the extent to which an acceptable medical source is familiar with the other information in the case record**.  There is no evidence that either Mr. Ramsey or Dr. Sweeten reviewed any of plaintiff's treatment records before formulating an opinion.  There is no evidence of their familiarity with Social Security disability programs.  In fact, Mr. Ramsey's interview three months before he completed the Medical Source Statement concluded that plaintiff qualified for Medicaid, it did not include any findings with regard to functional limitations. And as discussed above, Dr. Sweeten did not address any of plaintiff's allegedly disabling impairments in any of his treatment notes.

Plaintiff claims the ALJ's residual functional capacity finding is not supported by the medical evidence because he did not rely on a single medical opinion for his finding.  The ALJ determined plaintiff's residual functional capacity based on all the evidence in the record.  In addition to Dr. Sweeten's and Mr. Ramsey's opinions, the ALJ also considered Dr. Akerson's opinion and the treatment records of various hospitals and doctors.

The ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions of any of the claimant's physicians.  Martise v. Astrue,

641 F.3d 909, 927 (8th Cir. 2011).  The ALJ agreed with Dr. Akerson that plaintiff was only mildly limited in activities of daily living and moderately limited in maintaining concentration, persistence, and pace.  He also agreed that plaintiff would have difficulty with detailed instructions.  However, based on plaintiff's treatment records, the ALJ determined that plaintiff's social functioning restrictions were greater than Dr. Akerson assessed and included more restrictive limitations as a result.

Plaintiff's argument that the ALJ should have ordered more testing is without merit.  The ALJ need order further examination only when the record contains insufficient evidence to determine whether the claimant is disabled.  Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995).  That was not the case here.

Based on all of the above, I find that the ALJ did not err in discounting the opinions of Dr. Sweeten and Mr. Ramsey, and I further find that the substantial evidence in the record supports the ALJ's residual functional capacity determination.

## VIII.    CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled.  Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.


_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
January 13, 2014